In the

# United States Court of Appeals

### For the Seventh Circuit

No. 12-1524

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

JOSE MANUEL ZAMBRANO-REYES,

*Defendant-Appellant.*

Appeal from the United States District Court
for the Northern District of Illinois, Western Division.
No. 11 CR 50046—**Philip G. Reinhard**, *Judge.*

ARGUED FEBRUARY 15, 2013—DECIDED JULY 29, 2013

Before FLAUM, WOOD, and HAMILTON, *Circuit Judges.*

WOOD, *Circuit Judge.* Jose Manuel Zambrano-Reyes, then a lawful permanent resident, was removed from the United States on November 13, 2000. A decade later, immigration agents discovered that he was back in the country, and he was charged with illegal reentry. 8 U.S.C. § 1326. Zambrano pleaded guilty in October 2011, but on the eve of his February 2012 sentencing, he moved to withdraw his plea. The reason he offered

for this eleventh-hour move was that the Supreme Court's recent decision in *Judulang v. Holder*, 132 S. Ct. 476 (2011), coupled with its earlier ruling in *I.N.S. v. St. Cyr*, 533 U.S. 289 (2001), provided a new basis for him to mount a collateral attack on his original removal. The illegal reentry statute authorizes such challenges, provided the alien can establish three points: "(1) [he] exhausted any administrative remedies that may have been available to seek relief against the order; (2) the deportation proceedings . . . improperly deprived [him] of the opportunity for judicial review; and (3) the entry of the order was fundamentally unfair." 8 U.S.C. § 1326(d). The district court refused to permit the withdrawal of Zambrano's plea and sentenced him to 12 months and one day. We affirm.

## I

Zambrano pleaded guilty in 1993 to two counts of aggravated sexual abuse of a minor, an aggravated felony that rendered him deportable, see 8 U.S.C. § 1227(a)(2)(A)(iii), and served four years of probation. Until 1996, many permanent resident aliens facing deportation were entitled to apply for a discretionary waiver, known as Section 212(c) relief. *St. Cyr*, 533 U.S. at 295-97. There is no dispute that Zambrano, who had been in the United States since 1979 and did not serve any jail time for his felony offenses, would have been eligible to apply for a Section 212(c) waiver had his deportation order been entered before 1996. And there is some reason to think that such discretionary

relief would have been granted: between 1989 and 1995, immigration judges granted waivers to over 10,000 aliens, approving over 42% of all Section 212(c) applications filed. Julie K. Rannik, *Comment: The Anti-Terrorism and Effective Death Penalty Act of 1996: A Death Sentence for the 212(c) Waiver*, 28 U. MIAMI INTER-AM. L. REV. 123, 137 n.80 (1996).

Zambrano's removal proceedings did not begin until 1998, however, and in the interim, Congress significantly curtailed the availability of discretionary relief for aliens facing removal (the new term for deportation). With the passage of the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA), enacted on April 24, 1996, Pub. L. No. 104-132, and the Illegal Immigration Reform and Immigrant Responsibility Act of 1996 (IIRIRA), enacted on September 30, 1996, Pub. L. No. 104-208, Congress repealed Section 212(c) and replaced it with a much narrower form of discretionary relief known as "cancellation of removal." See *St. Cyr*, 533 U.S. at 297. Under the new regime, the Attorney General may still cancel removal for certain lawful permanent residents, but not for those convicted of aggravated felonies. 8 U.S.C. § 1229b(a)(3).

Following the passage of AEDPA and IIRIRA, it was unclear whether these amendments applied retroactively to bar the possibility of Section 212(c) relief for aliens who committed deportable offenses under the pre-1996 statutory scheme. The Attorney General adopted the position that AEDPA, and to a small degree IIRIRA, eliminated the Attorney General's discretionary power

to grant Section 212(c) waivers altogether, regardless of when the alien's criminal wrongdoing occurred. See *In re Soriano*, 21 I. & N. Dec. 516 (Op. Atty Gen. Feb. 21, 1997). In 2001, however, the Supreme Court held otherwise. At least for persons "whose convictions were obtained through plea agreements and who, notwithstanding those convictions, would have been eligible for § 212(c) relief at the time of their plea under the law then in effect," Section 212(c) relief remains available. *St. Cyr*, 533 U.S. at 326.

Despite the promise of *St. Cyr*, aliens facing removal for certain criminal offenses continued to encounter obstacles when seeking discretionary relief. One reason for this was an odd quirk in the way the Board of Immigration Appeals evaluated applications for Section 212(c) relief. Although we have spoken thus far of Section 212(c) as a form of relief from *deportation* of an alien already in the country, by its terms, the provision only applied to aliens facing *exclusion* from entry. See *Judulang*, 132 S. Ct. at 479-82. This created some "peculiar asymmetr[ies]," since "[d]eportable aliens who had traveled abroad and returned could receive § 212(c) relief, while those who had never left could not." *Id.* at 480. The Board resolved this problem by adopting the policy that Section 212(c) gave the Attorney General the authority to grant discretionary relief to aliens facing exclusion and deportation alike. *Id.* at 480; see *Matter of S—*, 6 I. & N. Dec. 392, 394-96 (BIA 1954); *Matter of Silva*, 16 I. & N. Dec. 26 (BIA 1976). Not every alien facing deportation was automatically eligible for a waiver, however, since the list of grounds that

rendered an alien excludable, see § 1182(a), was not perfectly congruent with the list of grounds that rendered an alien deportable, see § 1227(a). To determine whether Section 212(c) relief might be available in particular deportation proceedings, some form of comparison between the bases for deportation and exclusion was necessary.

The Board vacillated between two ways of making this comparison. One approach, perhaps the more intuitive, was to consider how the alien facing deportation would fare in an exclusion proceeding. *Judulang*, 132 S. Ct. at 481. If the specific offense that rendered the alien deportable fell within a statutory ground for exclusion, and no other bars would have applied in the exclusion context, that person could apply for a Section 212(c) waiver. *Id.* (citing *Matter of Tanori,* 15 I. & N. Dec. 566, 567-68 (1976)). The alternative approach, known as the "comparable-grounds" rule, undertook a comparison of the more general *grounds* for exclusion and removal. Only if the charged deportation ground consisted of a set of offenses "substantially equivalent" to the set of offenses comprising a particular exclusion ground could the alien be eligible for Section 212(c) relief. This result obtained even if the particular *offense* that made the alien deportable would also have made the alien excludable (and eligible for Section 212(c) relief in that context). The Board "definitively adopted" the "comparable-grounds" rule in 2005. *Id.*; *In re Blake*, 23 I. & N. Dec. 722 (BIA 2005).

To illustrate the difference between these two approaches, the *Judulang* Court posited a defendant

convicted of first-degree sexual abuse of a child, a particularly fortuitous hypothetical for our purposes. *Id.* at 482. Like Zambrano, this man could face deportation on the ground that he committed an aggravated felony involving sexual abuse of a minor. 8 U.S.C. § 1101(a)(43)(A). The conviction would also make him excludable, but on a different basis: the offense would qualify, along with many others, as a "crime involving moral turpitude." 8 U.S.C. § 1182(a)(2)(A). Applying the first approach, the same person would be eligible for a Section 212(c) waiver in the deportation context, because someone convicted of the same sexual abuse crime would be eligible to seek such relief in the exclusion context. The comparable-grounds rule produces a different result because the "moral turpitude" exclusion ground "addresses a distinctly different and much broader category of offenses" than the "'aggravated felony' involving 'sexual abuse of a minor'" deportation ground. *Judulang*, 132 S. Ct. at 482 (quoting *Blake*, 23 I. & N. Dec. at 728). The divergence is fatal: using "comparable-grounds," an alien like Zambrano would have been categorically barred from seeking discretionary relief when facing deportation, not because his aggravated felony was particularly grievous, but because of the coincidental breadth of the corresponding exclusion ground. In *Judulang*, the Court held that this approach, which hinges eligibility for relief "on the chance correspondence between statutory categories [rather than] the alien's fitness to reside in this country," was arbitrary and capricious. *Id.* at 484.

**II**

In moving to withdraw his guilty plea, Zambrano argued that he met the criteria for a collateral attack on the underlying removal order that provided the predicate for his charge of unlawful reentry. See 8 U.S.C. § 1326(d). His alleged ability to set that order aside, he asserted, constituted a "fair and just reason[] for requesting the withdrawal" of his plea. FED. R. CRIM. P. 11(d)(2)(B). The district court was willing to accept that Zambrano had exhausted his administrative remedies, but it concluded that he could not show either that the deportation proceedings improperly deprived him of the opportunity for judicial review or that the entry of the order was fundamentally unfair. It is necessary for us to address only the latter two points.

**A**

We look first at the question whether Zambrano was deprived of the opportunity to seek judicial review from his 1998 order of removal. He concedes that he was informed of his right to seek judicial review of the Board's decision, and that at the time this court had held that "direct review remains available . . . for aliens wishing to challenge their deportation on constitutional grounds." *LaGuerre v. Reno*, 164 F.3d 1035, 1040 (7th Cir. 1998). He argues that, as a practical matter, he nevertheless was deprived of the opportunity for judicial review for two reasons: (1) the scope of judicial review was limited at the time, because the Seventh Circuit had held that AEDPA eliminated habeas corpus relief for

aliens like Zambrano and that direct review was available only for constitutional challenges; and (2) the issue that he would have raised on direct review was decided against him (he believes) in earlier Seventh Circuit cases.

There are two problems with Zambrano's position. First, Zambrano's first point is similar to the one we rejected in *United States v. Roque-Espinoza*, where we explained that, despite the uncertainty regarding the availability of habeas corpus relief at the time of his removal, "[n]othing prevented [Roque-Espinoza] from playing the role of St. Cyr" and at least attempting to petition for review of his purported ineligibility for Section 212(c) relief. 338 F.3d 724, 729 (7th Cir. 2003). "The fact that [the defendant] chose not to make the attempt does not mean that he was deprived of all avenues of judicial review of his removal order." *Id*. Second, and more importantly, Zambrano misapprehends the state of the law in this circuit at the time of his removal. On August 23, 2000, five weeks before the Board issued its decision in Zambrano's removal proceedings, we held that Section 440(d) of AEDPA, which eliminated aggravated felons' eligibility for Section 212(c) relief, "cannot be applied retroactively to bar [an] alien from receiving a discretionary waiver under INA § 212(c)" where the alien "pled guilty to an aggravated felony before the enactment of AEDPA and relied, at least in part, on the availability of § 212(c) relief in making his decision to so plead." *Jideonwo v. I.N.S.*, 224 F.3d 692, 700 (7th Cir. 2000). The Supreme Court cited this opinion approvingly eleven months

later when it decided *St. Cyr*, 533 U.S. at 323 ("The potential for unfairness in the retroactive application of IIRIRA § 304(b) to people like Jideonwo and St. Cyr is significant and manifest.").

The failure of Zambrano's attorney to recognize the relevance of *Jideonwo* to Zambrano's then-pending case is unsettling, and this oversight would have been a strong argument for Zambrano to raise in a motion to reopen. Zambrano, however, has not raised any argument that his failure to seek judicial review should be excused for reasons of ineffective assistance of counsel, and given the stringent showing that the Board and we require for that argument, we can understand why. Given *Jideonwo*, it cannot be said that "the deportation proceedings at which [Zambrano's] order was issued improperly deprived the alien of the opportunity for judicial review." 8 U.S.C. § 1326(d).

B

Zambrano's remaining argument is that the Board's erroneous (in hindsight) determination that he was ineligible for discretionary relief made the entry of his removal order "fundamentally unfair" within the meaning of Section 1326(d)(3). Zambrano emphasizes that his argument is not "that discretion was exercised in a manner not to his liking," but rather that he "was wrongfully deprived of having the opportunity for the proper official to determine whether he should be allowed to remain in this country." See *St. Cyr*, 533 U.S. at 289 ("[T]he fact that § 212(c) relief is discretionary

does not affect the propriety of our conclusion. There is a clear difference, for the purposes of retroactivity analysis, between facing possible deportation and facing certain deportation. . . . Because respondent, and other aliens like him, almost certainly relied upon that likelihood in deciding whether to forgo their right to a trial, the elimination of any possibility of § 212(c) relief by IIRIRA has an obvious and severe retroactive effect."). The term "fundamentally unfair" is not defined in Section 1326(d), nor has the Supreme Court provided a comprehensive list of the procedural errors that might render an underlying removal fundamentally unfair. See *United States v. Mendoza-Lopez*, 481 U.S. 828, 839 n.17 (1987).

Zambrano acknowledges that this court has held that "due process does not entitle an alien 'to be informed of eligibility for—or to be considered for—discretionary relief.'" *United States v. De Horta Garcia*, 519 F.3d 658, 662 (7th Cir. 2008) (quoting *United States v. Santiago-Ochoa*, 447 F.3d 1015, 1019-20 (7th Cir. 2006)). He urges us to revisit this holding, however, relying heavily on the concerns articulated in Judge Rovner's concurrence in *De Horta Garcia*. *Id.* at 662 (Rovner, J., concurring). As Judge Rovner noted, our position regarding eligibility for Section 212(c) relief and Section 1326(d)'s "fundamental fairness" requirement is at odds with that of the Second and Ninth Circuits. *United States v. Copeland*, 376 F.3d 61, 70-73 (2d Cir. 2004); *United States v. Ubaldo-Figueroa*, 364 F.3d 1042, 1048 (9th Cir. 2004). There is also academic support for the position that the erroneous failure to consider an alien for Section 212(c) relief, or

to advise an unrepresented alien of his eligibility for such relief, is sufficiently "unfair" to satisfy Section 1326(d)(3) in a later reentry prosecution. See Anthony Distinti, *Gone but Not Forgotten: How Section 212(c) Relief Continues to Divide Courts Presiding over Indictments for Illegal Reentry*, 74 FORDHAM L. REV. 2809 (2006); Brent S. Wible, *The Strange Afterlife of Section 212(c) Relief,* 19 GEO. IMMIGR. L.J. 455 (2005). We also note that in *Mendoza-Lopez* itself, the decision that Congress sought to codify when it enacted Section 1326(d), the procedural error that undermined the validity of the earlier deportation proceedings was the immigration judge's failure "to explain adequately [the aliens'] right to suspension of deportation," another form of since-repealed discretionary relief, and to advise the aliens of their right to appeal to the Board. 481 U.S. 828, 839-40. The United States did not contest the lower courts' determination on this issue in *Mendoza-Lopez*, however, and so the Court did not explore the meaning of "fundamental unfairness" in this context in any great depth. *Id.*

As in *De Horta Garcia*, however, we leave this issue to another day. Because we hold that Zambrano was not deprived of an opportunity for judicial review, we have no occasion to explore the meaning of "fundamental unfairness" for purposes of Section 1326(d) in this case.

### III

We close with a few additional thoughts about *Judulang*, which, as we have explained, ultimately has no

bearing on our resolution of Zambrano's case. *Judulang* dealt with the Board's endorsement of the comparable-grounds rule for determining whether aliens remained eligible for Section 212(c) relief in the years following *St. Cyr*. Although the Board apparently invoked the rule intermittently before 1996, see *Judulang*, 132 S. Ct. at 488 ("[T]he BIA has repeatedly vacillated in its method for applying § 212(c) to deportable aliens."), it could not have been in place between 1996 and 2001, since at the time the Board regarded *all* aggravated felons as ineligible for Section 212(c) relief, regardless of whether the ground supporting their deportation had a "comparable [exclusion] ground."

*Judulang* would have had a significant effect on Zambrano's case were he facing removal for the first time today, since the Court's holding eliminated an alternative basis for finding Zambrano ineligible for discretionary relief. This may explain why Zambrano waited so long to seek to reopen his earlier removal proceedings. But *Judulang* does not alter our analysis of whether, at the time of Zambrano's removal, the Board erred in its interpretation of federal immigration law: we have already established that it did, and that Zambrano should have been considered for Section 212(c) relief. *Judulang* does not make the Board "more wrong" than it was already. On these facts, however, the Board's error is not enough to excuse Zambrano from criminal liability for his illegal reentry.

This takes us back to the core of Zambrano's argument. If he could have established a valid illegal reentry

defense under *St. Cyr*, he would have had a stronger argument for withdrawing his guilty plea, but *Judulang* is of no help to him there. As matters stand, he cannot establish a valid legal defense to his illegal reentry charge, and so the district court did not err—much less abuse its discretion—when it rejected the motion. Its judgment is therefore AFFIRMED.